In re Paniolo Cable Company, Addison Bonner appearing for appellant, Jonathan C. Bolton appearing for appellee. Counselor, Mr. Bonner, would you like to reserve time for reply? Yes, Your Honor. Five minutes, please. All right. Five minutes it is. You may begin. Thank you, Your Honors. May it please the Court, I'm Addison Bonner. I'm here for appellant, ClearCom Inc. We all know that summary judgment should not be granted in matters where there are genuine issues of material fact. ClearCom has filed this appeal because the bankruptcy court, in disposing of the underlying adversary proceeding, did so by summary judgment. And that was improper for three reasons. First, the bankruptcy court decided issues of the intent of the parties. And though there are genuine issues of material fact as to the intent of the parties in numerous of the, you know, key issues here. And we're talking about the intent of the parties in entering into certain agreements. The intent of the parties in making certain payments and in receiving certain payments and in what those payments were supposed to be for. The application of those payments and who the ultimate recipient of those payments were. Issues of intent that the bankruptcy court improperly decided. Next, the second reason the bankruptcy court erred relates to credibility determinations. It's clear from the bankruptcy court's rulings that the court found that ClearCom's representatives, the he's who submitted declarations in support of ClearCom's positions. The court believed that they were not credible. And when, in the summary judgment context, when ClearCom is defending against the summary judgment, they should have been given the benefit of the doubt. And they weren't. It's clear that the court just disregarded what they had to say, accepted what was presented in support of summary judgment, and found against ClearCom. Third, the bankruptcy court overlooked many issues of material fact in the case generally. And that's basically what's all laid out in the briefing. Mr. Bonner, this is Judge Corbett. I do have a question for you. You talk about Judge Ferris making credibility determinations. But I'm concerned about what was the objective evidence before him. And if you could please direct me to the objective evidence, not conclusory declarations, but objective evidence that supports the appellate's argument that the money paid by Charter to ClearCom after January of 2019 was for use of something other than the Paniolo Cable Network. Thank you. That's exactly what we're talking about. There are issues of material fact as to what that money was paid for. And I think, you know, going through the declarations and what people have said, I'll point you to specifically the declaration we submitted for Mr. Santos. And that was... Excuse me. Excuse me, counsel. Yes. He asked you for non-declaration testimony evidence, not the declaration testimony. So we understand that what Judge Ferris made the decision based upon was interrogatory responses. Answer other documents that were admitted. What objective evidence other than the declaration do you rely upon? That's basically all we have. And I think that's why it's so important that those determinations should not have been made in the summary judgment context. All we have because of just the history of relationships between these companies is, hey, what were the people doing? The people were actually on the ground negotiating these agreements, making payments, you know, addressing emergency situations. Why were these things happening? And that's why we need to get the full story. We can't just do this on a... That's not correct. I mean, that seems to fly in the face of the amount of the services being provided. You know, you have $68 million worth of payments over the years. You know, there's a detailed history of those payments spanning from 2019 to 2023. They break down into certain components and stuff. Where is the evidence that matches an invoice or a billing statement or what is the internal records from charter as to what was being paid for what? That's the problem. The only thing we really have is the October 2019 emails that result in the $120,000 payments. And then we have a string of $120,000 payments. Yeah, fair enough, your honors. And I mean, you know, there's evidence takes different forms, right? And so there are some documents in the case. And so I'm familiar with the, you know, string of invoices you're talking about there. But there are further questions because it's clear that these agreements encompass more than just those issues that you can see right there with those invoices. There are other reasons that these agreements exist. It's not just for use of the cable like the trustee is saying. It's not just for that. But counsel, it's true that there are no records. There is no document, no contract. There are no invoices. There's nothing other than your client's testimony in the declaration that suggests there's another explanation. Correct? Not just my client's declaration. It is true that there are just declarations. But we've also got Mr. Santos's declaration. And Mr. Santos doesn't work for my client. He works for charter, in fact. And so to me, that creates a significant issue of fact. You have two different people from charter saying, hey, one person is saying this is what the payments are for and this is what the contracts mean. And you have the other person who actually was part of creating the contract saying, no, actually these are for other things. And the only time we're making payments related to the Paniolo cable are during these special emergency situations. And because we're the defendant here, the trustee has to show what these monies were related to. So you say that there's evidence that the payments were for something else. I mean, there's no other cable and they needed cable service. Is there another cable that was used? We have the Paniolo cable. Right. And that was used by charter, right? And charter was making payments for the use of that cable. At a certain point in time. However, the Paniolo cable is not the only cable system that's covered by these agreements. Okay. Where's the evidence that says there's other cables? I mean, a cable is not too hard to find. In the documents, they're described as we're talking about circuits and infrastructure. So long story short, the agreements apply to all of the infrastructure and not just the Paniolo cable. But where's the breakdown? That's the problem is I understand that. And he said, yeah, there was other things. That's great. The problem that I think the court had and that we seem to have is that isn't anything. That's just saying that's not us. Right. So what is it? Where is it? What is the breakdown? Where is the detail to support that statement? Oh, we bought other things. So our position is that's really putting the burden on us as the defense. Whereas it's the trustee that's saying every dollar of payment that was made under these various agreements all related to the Paniolo cable. I mean, they point to Mr. Fujimoto's declaration. And again, it's short. I mean, a lot of this is short. I give you credit for that. And they say, look at the grand total. Is that everything that you paid? And was it from the Internet and video services rights and data purchased from 2019 to 2023? And he says, yes. There's a statement identifying specific payments to a specific agreement. They carry their burden. Then it shifts to you, doesn't it? And so that's why we're talking about the Santos declaration and that document. But it came in late, didn't it? Well, it came in afterward as part of a reconsideration. But that's when we became aware of this information. But were there documents to support Santos' declaration? Were there independent contracts, agreements, emails, invoices to support his position? So Santos is making his declaration based on his knowledge of having worked at Charter. So, I mean, to the extent that that's exactly why I think this matter should have proceeded and not been disposed of by summary judgment. Because then we could get into those issues. Santos could be deposed. They can ask him, hey, what's the basis for your declaration? And he can talk about all these emails and et cetera, et cetera. That Fujimoto... Mr. Bonner, confronted with the moving parties' materials, shouldn't you have done that? You needed to respond to the plaintiff's showing. And if there was another cable used or another piece of equipment that was used that relate to the payments, couldn't you have shown that? Couldn't you have gathered that information and given that to the judge before you called on the summary judgment? Well, we did respond by saying that, hey, you're not looking at the full picture. You're just assuming that all these payments were for this one use of cable. But everyone was aware that there are other cables and networks out there. It's just that, I mean, I don't know that specific information exists to say, you know, what was used, what networks were used in particular. But the fact is, these agreements that are at issue cover multiple networks, not just the Paniolo cable. And to the extent payments were made for a purpose other than the Paniolo cable, then the judge was wrong in deciding all of these dollars should be awarded to the trustee. I mean, that's our whole point. This matter should have been allowed to proceed further so we could resolve all these issues of material fact. You're at the five-minute mark. Do you want to reserve the rest of your time? Thank you. Yes, please. Thank you very much. All right. Counsel for Appley? May it please the court. My name is Jonathan Bolton, and I represent the plaintiff, David Farmer, in this matter, and the appellee here. I think the panel is sort of zeroing in on exactly the main points of this case, which is, you know, the trustee came forward looking for information about whether or not ClearCom had used this cable. It used its discovery. It used interrogatories to try to find out what the information was. Because remember, the trustee is sort of suspicious about whether this cable is being used and is using its discovery devices in order to figure things out. So, as the panel pointed out, we did have interrogatory responses where, first, they admitted that these contracts that were identified relate to the Paniolo cable assets. That's a pretty broad statement, though, right? You know, and that was the point he tried to make in the objection to the vague and ambiguous. They relate. But it gets to the detail. I think my problem with this case in general is it's just a lack of focus, of sharpness, as to these payments trace to these invoices for these services tied to these agreements. And you have your charts and your spreadsheets, and they show multiple. The easiest one to flow through are the 120,000, presumably, because that is your argument. That's the October 2019 agreement. Carry forward. It's only a fraction. It's not a million and change. It's not the six million. So, what ties the other six million? Okay. Well, remember, first, the first motion for summary judgment dealt with that 2019 agreement. And that 2019 agreement, all we had was emails and the internal documents that ClearCom did produce. So, that's what we had to go on. So, you're right. That one, remember, they admitted that related to the Paniolo cable. That was clear. They never disputed that that related to the cable, although they did claim it was only one month and only for an emergency. But then, as you recall, when we deposed the charter representative and we found out about this master service agreement, which we didn't know about before, that the testimony was that the 2019, let's call it, invoice and emails, was a part of that master service agreement. So, we didn't know that at the time, but apparently, that was done pursuant to the master services agreement. And then we asked, okay, well, if it was done pursuant to that master services agreement, you'll look at the testimony from the charter representative. What payments were made pursuant to the master services agreement and the 2019 agreement? So, that's what tied it all together, was that testimony from the charter representative said, the 2019 agreement was a part of the master service agreement. That's where it exhibits A and B, if I recall, and all the payments were made pursuant to that. So, that's how we tied together the master service agreement to the Paniolo cable. Now, remember, they also admitted that, as you said, it's broad, but they admitted in the interrogatory response that it did relate to the Paniolo assets. But clearly, when we have the 2019 piece of it, where they admitted it used the cable, which was a part of the master service agreement, that's what ties it all together. So, that sort of addresses some confusion I have. Are you referring to the deposition on the interrogatories to Mr. Fujimoto? Yes. All right, as a charter representative. And then ultimately, the most significant statement is directed to looking at the exhibit, which is the spreadsheet that has a grand total for the $6 million and change, I believe. Yes. I believe, you know, the interrogatory is that reflects the amount charters paid to ClearCom from January 1, 2019 through February 2023. Yes, pursuant to exhibit C, the internet and video service rights and data from 2019 to 2023. When was the internet and video service rights executed? That is a, I have a copy of it. I think it was executed in 2021, I believe. That's the 2021 agreement. So, that came after the settlement. But that means that Mr. Fujimoto's statements that the payments from January 2019 to 2023 could not have been on the internet and video, doesn't it? That's a very good point. That's a very good point that you're pointing out that didn't hit me before. Yeah, I believe that video services agreement was from 2021. And you're right, it does say 2019 through 2023. And I haven't looked back to compare that. But that's a very good question. I don't know the answer to why he would have said that. But I believe it is a 2021 agreement. I'd have to look back and check. I think you're right. I think it's 2021. But that spreadsheet and spreadsheets of other things and checks go to 2019, to January 2019. What is the evidence that those early payments predating the October 2019 agreement relate to ClearComm's leasing of capacity on the network to charter? Okay, so with respect to ClearComm's use of the cable, 2019 through 2020, I believe all of those relate to the first two contracts, which are the master services agreement and the 2019 agreement. I think we called it the October agreement. You do point out that on this video services agreement, there's a gap there. There's two years worth. And I'm not sure if, for example, you can see from the record that it's very unclear about exactly how these people do business. Sometimes ClearComm is acting as the agent for SIC. It's always been unclear to the trustee exactly what's been going on. It's kind of like a shell game moving things around. This was a specific interrogatory, and he did answer it the way that he answered it. But there is a question about those dates. It may be that they were doing this service before they entered into the contract, because there was some of that. For example, in the 2019 agreement, you saw emails. They would email about coming into an agreement and then later document it. It could have been the case. I just don't know. I don't think that's in the record. Part of the $6 million goes back, like I said, to 2019, January running through all of 2019. The beginning of 2019 is generally for charges of $6,279. One, that predates the settlement agreement. Right? Yes. So how is that recoverable as a damage? Okay, well, I think what Judge Ferris did was, remember, there's three contracts. The earlier contracts, let's call them the two that came before 2020 when the settlement was, and then this 2021 agreement, which was after. Judge Ferris, I think, in his opinion, essentially said, look, it was a breach, but I'm not awarding you breach of contract damages. I'm awarding you restitution and unjust enrichment, because that money from charter should have gone to Paniolo for the use of its equipment. So he didn't necessarily tie the breach of contract, which arguably did occur because they did make a representation that they hadn't entered into agreements. But the damage really came from the fact that ClearCom worked with SIC to allow use of the Paniolo cable network when it was not permitted. And Judge Ferris said that was wrong, because the estate of Paniolo should have gotten that money. They were unjustly enriched by using that cable and not paying the proper person, the owner of the equipment, which was Paniolo. Judge Gann, I think, was asking a little bit about the documents and whether there's any documents supporting Mr. Santos' declaration. I want to point out to the panel is this Santos declaration that came in with the motion to reconsider, it's curious that Mr. He didn't come forward and put forth the same sort of facts that Mr. Santos was alleging, because remember, ClearCom and Mr. He, they were the other side of the transaction. So they could have come forward earlier and tried to come forward with the evidence that Mr. Santos was trying to put in at the last minute. It's curious, number one, that they didn't talk to Mr. Santos beforehand. Remember, you'll recall in the record, ClearCom made an allegation that Mr. Santos was somehow prevented from testifying. There's no evidence of that. Nobody knows where Mr. Santos came from. But if there was evidence that was contrary to what was said earlier by ClearCom, of course Mr. He or Mrs. He could have come forward and said the same evidence. And they didn't do that. And I think what you see in this case is, from the beginning, the first motion for summary judgment, there was very little dispute by ClearCom about the facts being alleged by the trustee. Again, the trustee was shooting in the dark. We didn't know exactly what was going on. We've got some documents, we've got some discovery, and we were kind of pursuing our way through that. So we got the first motion for summary judgment. They didn't make any claims that it didn't relate to the cable. They didn't make any claims that it was expired like they are now. So then we move on on a partial summary judgment. We do some more discovery and come back with our second motion for summary judgment. And that's when we found out about this master services agreement. And so we tied that in as well and said, Your Honor, it's also a breach because, as shown by the charter testimony, the 2019 and master services agreement tie together. They never disputed that the second one related to the cable so that they shouldn't be disputing that the master services agreement relates to the Paniolo assets. And again, if you look at their responses to the second motion for summary judgment, and in particular what they did in their concise statement, they actually admitted that it related to the Paniolo cable assets. The big defense that they had, if you recall, was that, yeah, ClearCom received the money, but it gave it to SIC. So that was sort of their big defense in trying to defend against the second motion for summary judgment was, yeah, we got the money, but we were sort of a mere conduit because we gave it away to SIC right away. So then, of course, as the case proceeds, we had amended our damage claim down because we figured out that we double counted. So we told the court, look, Judge, we figured out we made a mistake. We want to amend our pleadings and lower the pleadings because we double counted. And Mr. Bonner asked the court to file a reply, a surreply, that is. And the judge said, look, you can file a surreply, but I only wanted to deal with the narrow issue of these damages that have changed. And Mr. Bonner took that opportunity to basically re-argue the entire case. And that was improper. I think Judge Ferris noted that in his opinion. He said, you know, it was a limited reason why he allowed them to do the surreply. And it was improper, and it said, I think in 2017 of his opinion, he says, contrary to the court's direction. So I think Judge Ferris, you know, was pointing out the fact that, look, you guys weren't supposed to do this. But he did look at it. He did consider it. And even looking at the stuff that they filed, he compared these declarations to the evidence that was before him that we've talked about. The discovery, the interrogatories, the testimony of the witness from Charter, and said, you know. What is your strongest evidence that all these multimillion dollars were actually for use of the Paniolo cable network? I think the strongest evidence is the 2019 agreement. And if you look at also their admissions and their responses to the motions for summary judgment. Because I think in the second response to the summary judgment, they actually pled in their pleading and they pled in their pleading. Sorry, let me find it, Your Honor. On page seven of their response, it says, contrary to plaintiffs' assertion, ClearCom did not receive the benefit of the monies paid by Charter for the use of SIC's capacity on the Paniolo cable network. So I think the admissions that they make, plus that 2019 agreement, Your Honor, is the best evidence we have. Plus, of course, I said the discovery, and you alluded to it. It was vague. The interrogatory response where it said relate to or relate to access to. But in our mind, the question, although maybe not well directed, what we were looking for in that discovery was are you using the Paniolo assets? It's clear from the complaint that that's what we were after. Maybe it could have been worded a little better. But when we saw that response, we took that as, okay, these contracts relate to the use of the Paniolo cable network. And that's what we had to go on. Thank you. Any other questions, Judge Gabb? Judge Corwin? Thank you, Mr. Mohler. Thank you. All right, Mr. Bonner, I think you have about four and a half minutes left. Thank you, Your Honor. So I think really two things I want to respond to. One is Clercon's not in here saying that the Paniolo assets were never used for anything. We're not in here saying that. What we are saying is the use was quite limited, as Mr. Santos said, and also that those monies were paid over to sandwich shops. That's the first thing. So there's no admission that, you know, every single dollar was related to the use of the Paniolo network. So that's the first thing. The second thing is what, you know, the opposition is doing is basically using our discovery response. We're the ones who produced these documents just in an effort to be honest. We're not trying to hide these documents because they found these in some other... Mr. Bonner, if the payments were limited or the amount of the payments was limited with respect to the Paniolo cable, what was the balance used for? I mean, there's no evidence that came in for some other cable or some other equipment. Except that the agreements themselves cover use of other equipment, not just the Paniolo cable. I don't think the other side would dispute that. There are other networks. I didn't see anything that said, well, we paid this money, okay, a limited amount. I don't know, assigned some percentage to it. You know, 30% of it was for the Paniolo cable. The other 70% was for X, Y, and Z. But I don't see anything other than conclusions saying that it was for X, Y, and Z, but nobody's saying or identifying the X, Y, or Z. Right, so again, I think those are the issues of material fact. What were those for? And I don't think it's our responsibility. But your client was asked about these things, and your client was facing a summary judgment. And to oppose that summary judgment, shouldn't you... Your clients would have known what the X, Y, and Z were. Why didn't you tell Judge Farris what they were as part of your response to the summary judgment? Well, the response was essentially there for other networks. But in our view, the specifics of the other networks are really not germane. Well, it changes the statements in your response from just sort of a conclusory statement to something that is based on objective evidence. And I just don't see anything else that you could have paid for it. You just said it might be. So I think, you know, this goes to another concern my clients always had related to the Stern v. Marshall case, right? About what jurisdiction should the bankruptcy court have? Because ClearComm's not a party to the bankruptcy proceeding other than in this adversary proceeding. And so really what we're talking about here and what the bankruptcy judge decided was that all of these agreements, he basically interpreted them and he prejudged what payments between these entities or these parties to these agreements as thinking about the underlying bankruptcy matter that ClearComm really is not a part of. Okay, well, ClearComm was a party in the adversary action, right? Just that. Just that, yes. And they were served with process. Right. And just in that proceeding. But my point is, just because payments were made to ClearComm by charter doesn't mean that they relate to this bankruptcy asset. You've been to at least some part, even in a limited, you use the estate's assets. Yeah, I mean, I don't think that's... That would be the tie. Right. Well, I mean, to a limited extent, yes. And that's our whole point here is why did the bankruptcy judge just prejudge this thing and go straight to summary judgment when actually there's a lot of nuance to this and it's not as simple as every dollar that charter paid over is damages. It's just not. And so that's really what our argument is. All right. Thank you. Any other questions? Well, thank you for a very interesting argument. The matter will be deemed submitted and we'll try to get it out of the system as soon as possible. Thank you both. Madam Clerk, can we call the next matter?
judges: Spraker, Gan, and Corbit